FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 DEC -7 PM 3: 23

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOANNE FAVALORO,                    )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )        CV 99-BU-0402-S
                                    )
CRESTMONT, L.L.C. and DECATUR       )
HOTEL CORPORATION,                  )        ENTERED
                                    )
        Defendants.                 )        DEC 0 7 1999

## MEMORANDUM OPINION

The above-styled cause is presently before this Court on cross motions for summary judgment. Plaintiff, Joanne Favaloro, sued Defendants Crestmont, L.L.C. (her former employer) and Decatur Hotel Corporation (the managing member of Crestmont, L.L.C.) alleging breach of contract, fraud, and intentional infliction of emotional distress. Defendant Decatur Hotel filed a counterclaim, seeking payment of a bill for cellular telephone service. The Court treats the counterclaim as a claim for subrogation.

For the reasons set forth below, Plaintiff's Motion for Summary Judgment is due to be denied. Defendants' Motion for Summary Judgment is due to be granted in part and denied in part.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of

the proof the parties bring to bear in order to ascertain whether there is a genuine need for a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)). Summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party's burden is not meager; it must illuminate for the court the reasons why the nonmoving party cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Id.* The moving party's burden was set forth in *Clark* as follows:

> The moving party bears the initial burden to show the district court, ***by reference to materials on file***, that there are no genuine issues of material fact that should be decided at trial. ***Only*** when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. ***Even after Celotex it is never enough to simply state that the non-***

*moving party cannot meet its burden at trial.*

*Id.* (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54)(emphasis added)[1]

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id.*; *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court

---

[1]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* rule for [an] uncommon situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608. In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to record, that the non-moving party cannot prove its claim. *Id.* at 607. Obviously, this case does not fall into the "uncommon situation." addressed in *Celotex*. *See* Def. Brief, p. 14.

must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## II.   STATEMENT OF FACTS

Ms. Favaloro sent the following letter, dated January 28, 1998, to F Patrick Quinn as "President and CEO" of "Decatur Hotel Corporation":

> . . . I thought it would be best to put my employment requests and expectations in writing to you prior to your trip in order to give you time to digest everything. I have given this a great deal of thought Patrick . . . I want to work with you and the Crestmont Hotel and hope that we can reach a quick decision regarding my move.
>
> The Salary requested is $59,000.00, and I would like a two-year commitment in writing.
> There would be no incentive or bonus plan for the first 12 months of employment.
> At the end of the first 12 months, an incentive plan, to include

ownership opportunities will be developed and implemented for the second
12-month period.
>Family hospitalization coverage
>Dry cleaning
>Daily meals
>Two weeks paid vacation after one year.

I am prepared to tender my resignation at the Sheraton Birmingham and join
your team immediately.  . . .

Def. Exh. 3.

In response, Mr. Quinn sent Plaintiff a letter, dated January 29, 1998, which stated:

We are excited to confirm our conversation in which you have agreed
to manage the Crestmont Hotel/Quality Hotel & Suites in Birmingham,
Alabama.

To reiterate the main points of our agreement, we are offering you the
following compensation package:

1) Salary of $59,000 per year;
2) A minimum of two years of employment unless mutually agreed upon
   by both parties;
3) A bonus and incentive plan after 12 months with ownership
   opportunities;
4) Start date either February 9 or February 16, 1998;
5) A family hospitalization plan;
6) Dry cleaning cost reimbursement;
7) Daily meals;
8) Two weeks paid vacation after one year.

If the above is as you understand our agreement to be, please so
indicate in the space provided and return it to me as soon as possible.

We look forward to a mutually beneficial relationship in the Crestmont
Hotel and its new franchise with Choice International.

Def. Exh. 5.   Plaintiff signed on the line provided to signify her acknowledgment,

agreement and understanding of the "delineated terms of our agreement."  *Id*.

Defendants have filed the affidavit of Charles Reichman,[2] who contends that he sent the letter agreement to Plaintiff together with a "package" containing "the Employee Manual with attached acknowledgment form, a new hire form and state and federal income tax forms." Def. Exh. 11.

The cover of the handbook states, "Decatur Hotel Corporation: Employee Manual." Def. Exh. 10. It opens with the words, "Welcome to the staff of Decatur Hotel Corporation." *Id.* at 1. Also, the first page of the manual states that employment at Decatur Hotel is "at will." It states, "Employees may quit their job at any time, but are expected to provide two weeks' [sic] notice of their leaving. The Decatur Hotel Corporation may terminate an employee at any time for any reason, and with no notice." *Id.*

The Handbook also contains a drug and alcohol policy, which provides, in part, "Hotel policy prohibits an employee's use of drugs off of hotel property or after hours. . . . A violation of this policy will result in termination." *Id.* at 10. The policy provides for drug testing of employees and unannounced searches. *Id.* at 11.

Attached to Decatur Hotel Corporations's handbook is an acknowledgment form. Def. Exhs. 7, 11. The form provides three places for the employee's signature (1) the acknowledgement form for her uniform and name tag, (2) the drug-free workplace policy, and (3) acknowledgment for the employee handbook. Def. Exh. 7.

The "Drug Free Workplace" section states:

I understand that it is the express policy of the Decatur Hotel Corporation

---

[2]Apparently, Mr. Reichman is an employee of either Crestmont or Decatur Hotel. His affidavit does not identify his position or his employer.

that when I come to work I should be lucid, sober, and prepared to perform my job functions; without endangering my co-workers or myself, because of drug/alcohol use on/off job site.

If I use any prescribed/non-prescribed drugs which may impair my ability to perform my job, I will immediately notify my supervisor. I understand that I am subject to drug/alcohol testing at any time, but especially after an accident. If I violate this policy I will be terminated immediately and I may forfeit any rights that I may have had to worker's/unemployment compensation.

I have read and understand this policy.

Def. Exh. 7. Plaintiff did not sign the "Drug Free Workplace" acknowledgment form.

The "Employee Handbook Acknowledgment" form states:

This is to acknowledge that I have received a copy of the EMPLOYEE HANDBOOK and understand that it outlines my privileges and obligations as an employee with DECATUR HOTEL CORPORATION.

I further understand that I am governed by the contents of the Employee Handbook and that it is my responsibility to familiarize myself with all information in the handbook.

Since the information, policies, and benefits described in this handbook are subject to change, I understand and agree that such changes can be made by the company in its sole and absolute discretion, and agree to observe these change [sic] in all respects.

I acknowledge that I may quit my employment at any time, but that I will endeavor to provide two weeks' notice of my leaving. I also acknowledge that the company may ask me to leave my employment at any time, for any reason, and with no notice.

Def. Exh. 7. Plaintiff did not sign the "Employee Handbook Acknowledgment" form.

Other forms, allegedly sent by Mr. Reichman in the package with the letter, were

completed by Ms. Favaloro. She completed and returned the Employee Withholding

Allowance Certificate for the Louisiana Department of Revenue, which indicated the

Page 7 of 29

"employer's name" was "Decatur Hotel Corp." Def. Exh. 9. She completed and returned the Employee Withholding Allowance Certificate for the IRS, which indicated the "employer's name" was "Decatur Hotel Corp." Def. Exh. 10. She completed and returned the Employee Eligibility Verification for the Department of Justice, which indicated the "employer's name" was "Decatur Hotel Corp." Id.

The New Hire Form, completed on a form that has "Decatur Hotel" across the top, indicates that Ms. Favaloro was to work for "The Crestmont Hotel." Def. Exh. 8. The form was completed by Sharon Olmsted, "Human Resources Director," for the Decatur Hotel Corporation. Id.; Def. Exh. 12. Ms. Olmsted, according to her affidavit, contacted Plaintiff regarding the return of the acknowledgment forms. Def. Exh. 12. The face of New Hire Form shows notations from Ms. Olmsted, indicating that she had contacted Plaintiff on February 26, 1998, and March 12, 1998.[3] Def. Exh. 8. Plaintiff denies that Ms. Olmsted ever asked her to return the acknowledgment form. Pl. Depo. (Vol. II), p. 33. There is nothing in the record to indicate that anyone discussed the acknowledgment form – regarding the handbook or the drug policy – after March 1998.

During October 1998, according to Defendants, reports began to surface of "erratic and unprofessional behavior." Def. Exh. 4, ¶ 4. In his affidavit, Mr. Quinn avers:

. . . I received reports of erratic and unprofessional behavior and

---

[3]Ms. Olmsted states in her affidavit that she called Plaintiff on March **2**nd; however, the new hire form clearly states, "Called 3/**12**/98 called again & told Joanne I still don't have her page w/ signature form emp. H.B." Def. Exhs. 8; 12. Ms. Olmsted states that she made "contemporaneous" notes of her conversations with Plaintiff on the New Hire Form. The affidavit also states that the New Hire Form is attached to the affidavit; it is not. Def. Exh. 12.

suspected drug use by Joanne Favaloro from several employees, including Assistant General Manager Karen Watford, Sales Manager Janet Wallace, and from the hotel restaurant lessee Dwayne Albright and the security service employed by the hotel. The security service reported that Ms. Favaloro was observed sniffing a substance, suspected to be cocaine, at the hotel. Dwayne Albright reported that Ms. Favaloro smoked marijuana on hotel premises and offered some to him. I sent Brent Kovach to investigate.

*Id.*

Defendants contend that Plaintiff used cocaine at the hotel. In support of this assertion, Defendants have submitted a report from a security guard and the report of laboratory analysis. Def. Exhs. 13 & 14. The report from the security guard is not dated; the top of the report form, which contains a space to record the date of the incident, is conspicuously omitted from the Court's copy. *Compare* Def. Exh. 13, p. 0012 *with* Def. Exh. 13, p. 0013. The report does not refer to Plaintiff by name. Def. Exh. 13. It states only that the security guard observed the "general manager" crush a substance with a name tag on a piece of paper and then sniff the substance. *Id.* The security guard retrieved the paper and the name tag after witnessing the incident. *Id.* The report indicates that the piece of paper and the name tag were thereafter removed from the premises. *Id.*

The forensic report indicates that the testing laboratory received the piece of paper and the name tag on June 23, 1999, almost eight months after Crestmont fired Ms. Favaloro. Exh. 4 ¶ 5; Exh. 14. Defendants' counsel told the laboratory that the piece of paper and the name tag had been kept in a safety deposit box on the premises of the Birmingham hotel. Exh. 14, p. 1. The report does not indicate that the laboratory was told how long the piece of paper and the name tag had been in the safety deposit box. The

Case 2:99-cv-00402-HDB   Document 47   Filed 12/07/99   Page 10 of 29

name on the name tag was "Barbara." *Id.* The report states that a micro crystalline test of the piece of paper and the name tag was positive for cocaine. *Id.* at 2. The residue on the name tag was insufficient to conduct a GS/MS (gas chromatograph/mass spectrometry) assay; however, the GS/MS assay was positive for cocaine on the piece of paper. *Id.*

Defendants submitted the affidavit of Brent Kovach, which states that the security guard gave him the piece of paper and the name tag on October 26, 1998. Def. Exh. 16. He avers that he placed the items in the safety deposit box and he kept the only key to the box. *Id.* Also on October 26, Mr. Kovach met with Ms. Favaloro because he had received reports from "hotel employees, the hotel restauranteur, and the independent security guard" that Plaintiff "was behaving erratically and unprofessionally, was suspected of having a drug problem and was observed using cocaine on hotel premises."

During this meeting, Mr. Kovach and Ms. Favaloro discussed her "management style." Ms. Favaloro testified that Mr. Kovach "intimated that [her] style might have been a little bit too intimate for him." Pl. Depo. (Vol. II), p. 63. She testified that he "lectured" her about fraternizing with guests. She testified that Mr. Kovach did not approve of her "being friendly" with the guests and "maybe having a glass of wine." *Id.* at 64, 66. Ms. Favaloro denies that she ever engaged in inappropriate and/or sexual conduct with hotel guests. *Id.* at 70-71.

Defendants have presented a letter from a hotel guest, in which the guest recounts an incident in which Ms. Favaloro removed her blouse and revealed her breasts in the bar at the hotel. Def. Exh. 15. Ms. Favaloro disputes that she ever showed her breast in the

Page 10 of 29

hotel bar and testified that she had rebuffed the guest's sexual advances on numerous occasions. Pl. Depo. (Vol. II), pp. 77-81.

Ms. Favaloro testified that Mr. Kovach raised the subject of illegal drug use during the meeting by telling her that "they were thinking of implementing a drug testing policy." *Id*. at 82. She testified that she told Mr. Kovach, "[I]f you are asking me to go take one, I will tell you that I would fail it today." *Id*. at 83. Plaintiff testified that she told Mr. Kovach that she had used marijuana and that she would test positive for that substance, but not positive for cocaine. *Id*. at 83-84. Ms. Favaloro testified that, during the meeting with Kovach, she denied using cocaine. *Id*. at 84. Plaintiff testified that Mr. Kovach said to her, "I'm not worried about marijuana use[ ] so much, . . . even though I detest it and I detest people that use it. What I'm concerned about is the fact that I think you're using cocaine." *Id*. Plaintiff denies using marijuana and/or cocaine while at work. *Id*. at 47-48.

Ms. Favaloro told Mr. Kovach that she would do anything to keep her job. *Id*. at 90; Def. Exh. 16. Mr. Kovach states that he told Ms. Favaloro "that she must immediately cease all illegal drug use, get into some sort of rehabilitation program, and submit to weekly drug testing as a condition of continued employment." Def. Exh. 16. Plaintiff testified that she and Mr. Kovach agreed that she would go to the doctor to get a referral to a drug program. Pl. Depo., p. 88. She testified that she told Mr. Kovach that she did not believe she had a problem with marijuana, but that she would seek help to discontinue using marijuana. *Id*. at 89. The meeting ended with Ms. Favaloro agreeing to get a doctor to refer her to a treatment program; Ms. Favaloro testified that Mr. Kovach told her, "You're going to be fine. I have faith in you." *Id*. at 94.

Page 11 of 29

After meeting initially with Mr. Kovach, Ms. Favaloro wrote a letter to Mr. Kovach and

Mr. Quinn. The letter stated:

> First off, I would like to apologize for the mistakes I have made. I am humiliated and saddened, but rest assured these same mistakes will not happen again. Nothing means more to me than my reputation, which up until today has never been blemished.
>
> I can and will make changes in my lifestyle because I realize they are needed to further my career development. The most difficult part will be to hold my head up high while trying to do so. Changes in my management style and re-establishing my credibility with you and my staff is most important. The Lord will help me with the others.
>
> Effective immediately, I am implementing a self-imposed rehabilitation. I have already begun to seek professional assistance to help me in this area. No matter how strong willed I am, the help of a physician will insure my success.
>
> Upon my return from the Choice meeting and hopefully a few days off, I will lead the way for our hotel's drug testing, and volunteer to provide periodic reports from my medical provider.
>
> Regarding my training and development as the General Manager, I respectfully request your patience. As I examine myself during the coming weeks I am sure it will become obvious where my weaknesses are. I have hopes that the Choice meeting will provide the first stepping stone in this direction. During the next 2 weeks I will develop a list for your consideration. Of course, I would ask you to offer constructive suggestions from both of you. I want to win back my name and your faith, and will do whatever is necessary to do so.

Def. Exh. 17. Contemporaneous with writing this letter, Ms. Favaloro made an

appointment with her doctor in order to obtain a referral to a rehabilitation program to stop

using marijuana. Pl. Depo., pp. 100-01, 107. She saw her physician the next day. *Id.*

at 101.

She told her doctor that her employer thought she had a problem with cocaine use

and the doctor replied that he did not see evidence of such a problem. *Id*. at 115. Ms. Favaloro testified that she told the doctor she used marijuana and that the doctor replied "he didn't think that was any big deal." *Id*. at 116. Nevertheless, Ms. Favaloro was committed to a rehabilitation program to stop using marijuana. *Id*. at 118. The doctor gave her a referral to a drug treatment center.

Shortly after her conversation with Mr. Kovach and the day of her doctor's appointment, Mr. Quinn called Ms. Favaloro at home. *Id*. at 126. She testified that he asked her how she was feeling. *Id*. at 110. She denied that she had admitted cocaine use to Mr. Kovach; according to Plaintiff, Mr. Quinn told her that he was not concerned about marijuana use, only cocaine. *Id*. at 111. Plaintiff told Mr. Quinn that she was going to stop using marijuana. Also, she told him that she had been to her doctor and that he had given her a referral to a treatment center. *Id*. at 113-14. She told Mr. Quinn that her doctor had said that marijuana use was no big deal. *Id*. at 118-19. However, she never told Mr. Quinn that she did not intend to stop using marijuana. *Id*. at 122.

Fifteen minutes after talking with Mr. Quinn, Mr. Reichman called Ms. Favaloro and told her she was fired. *Id*. at 134.

Mr. Quinn testified that he contacted Ms. Favaloro on October 29, 1998. His affidavit contains the following version of the discussion:

[D]uring the conversation I asked her when she would be drug tested and when her treatment would begin. Ms. Favaloro stated she could not understand why we were persecuting her. She stated that she could see nothing wrong with her using marijuana and that her doctor had stated that he would smoke it himself if he were [sic] not allergic. She further stated that her doctor did not see what was the big deal and did not think she needed rehabilitation. I asked her about her cocaine use, and Ms. Favaloro did not

deny that she used cocaine at work. She did deny that she had admitted her
cocaine use to Mr. Kovach. Based on Ms. Favaloro's statements, it was
clear that Ms. Favaloro was not going to discontinue using the illegal drug
marijuana and was not going to submit to rehabilitation and weekly drug tests
as agreed. I contacted Charles Reichman and asked him to terminate her
employment.

Def. Exh. 4 ¶ 5.

Ms. Favaloro testified that Mr. Reichman told her that she was fired for her

"purchasing practices, [her] management style, and [her] admitted drug use." Pl. Depo.,

p. 136.

Defendants have submitted numerous telephone bills, sent to Decatur Hotel, for two

cellular telephones allegedly issued to Plaintiff. Plaintiff was unable to identify the

telephone numbers appearing on the bill as those belonging to the two cellular telephones

she had used. Nevertheless, Plaintiff testified that she had acquired two cellular

telephones and was willing to pay the bill for the use of the two telephones that was

charged to Decatur Hotel. There is no evidence that Decatur Hotel has paid any amount

on these bills.

## III.   **DISCUSSION**

### A.   BREACH OF CONTRACT CLAIM

Both parties have moved for summary judgment on Plaintiff's breach of contract

claim. For purposes of examining Plaintiff's Motion for Summary Judgment, the facts will

be viewed in the light most favorable to Defendants; for purposes of examining

Defendants' Motion for Summary Judgment, the facts will be viewed in the light most

favorable to Plaintiff.

"In a diversity action such as this one, Alabama's substantive law, including its choice of law rules, governs the case." *Morris v. SSE, Inc.*, 912 F.2d 1392, 1394 (11th Cir. 1990)(citing *Klaxon Co. v. Stentor Electric Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941)). "[T]he choice of law rule followed by Alabama provides that the law of the state wherein the contract was executed governs questions regarding the validity and interpretation of the contract." *American Nonwovens, Inc. v. Non Wovens Engineering, S.R.L.*, 648 So.2d 565, 567 (Ala. 1994) (citing *Harrison v. Insurance Co. of North America*, 294 Ala. 387, 391, 318 So.2d 253, 257 (1975); *Macey v. Crum*, 249 Ala. 249, 252, 30 So.2d 666, 669 (1947); *Furst & Thomas v. Sandlin*, 208 Ala. 490, 492, 94 So. 740, 742 (1922)). The contract at issue in this case is governed by Alabama law.

1.      Plaintiff's Motion for Partial Summary Judgment

Plaintiff's Motion for Partial Summary Judgment asks this Court to enter an order finding Defendant Crestmont liable for breach of contract on the grounds it terminated Ms. Favaloro in violation of the terms of the parties' agreement that she could be terminated only by mutual agreement. Defendant contends that Ms. Favaloro's motion is due to be denied because (1) the language of the agreement is ambiguous; (2) the agreement is not a complete integration of the parties' agreement, which included the terms of the employee manual and the drug-free workplace policy; and (3) Plaintiff breached the agreement by failing to perform her duties as General Manager. Plaintiff has moved to strike, as inadmissible parol evidence, the employee handbook and the drug-free workplace policy. That motion has been denied in a separate order.

a.    Is the language ambiguous?

Under Alabama law:

Whether the terms of an agreement are ambiguous is a question of law to be determined by the trial court. *Glenn Armentor Law Corp. v. Counts*, 683 So.2d 964 (Ala. Civ. App. 1994). Where the terms are certain and clear, the court's duty is to determine the meaning of those terms. *Id.* It is not the function of the trial court to make new contracts for the parties or to raise doubts where none existed. *Glenn Armentor Law Corp.*

*Archer v. Hall*, 721 So.2d 194, 194-95 (Ala. Civ. App. 1998), *cert. denied.* "Unless the language of the [contract] is fairly and reasonably susceptible to more than one construction, there is no basis for a court interpretation. [The n]eed for construction arises only from the presence of ambiguous, uncertain or conflicting terms. *Michigan Mutual Liability Co. v. Carroll*, 271 Ala. 404, 123 So.2d 920." *United Services Auto. Ass'n v. Smith*, 57 Ala. App. 506, 510, 329 So. 2d 562, 565 (1976). Moreover, "[t]he test to be applied by [a] court in determining whether there is ambiguity is not what the [contracting party] intended its words to mean, but what a reasonably prudent person [making a contract] would have understood them to mean." *State Farm Fire & Casualty Co. v. Slade*, 1999 WL 667291, 13 (Ala.)(quoting Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:14, pp. 21- 23 (3d ed.1997)).

In Alabama, a party must abide by the unambiguous terms of its agreement. The Alabama Supreme Court stated:

It is not the province of the court to make contracts for the parties, but its duty is confined to the interpretation of the one which they have made for themselves without regard to its wisdom or folly. As said by this court in *Union Cent. Relief Ass'n v. Thomas*, 213 Ala. 666, 106 So. 133, 134 [(1925)]: "We do not understand why parties in their right mind should enter into such contracts; but these parties did, the court has no authority to make a contract

for them, and the contract, lawful in its provisions though it may be considered improvident on the part of plaintiff, must be given effect, if at all, according to its plain and inescapable meaning." And *Union Central Relief Ass'n v. Johnson*, 198 Ala. [488] 491, 73 So. 816, 817 [(1916)]: "Where the language is unambiguous, and but one reasonable construction of the contract is possible, the court must expound it as it is made by the parties."

*Oates v. Lee*, 222 Ala. 506, 507, 133 So. 44, ** (Ala.1931), *quoted in David Lee Boykin Family Trust v. Boykin*, 661 So.2d 245, 252 (Ala. Civ. App. 1995).

The portion of the agreement that is at issue is the term, "A **minimum** of two years of employment **unless mutually agreed upon** by both parties." Pl. Exh. A (emphasis added). Defendant Crestmont contends that it intended that Ms. Favaloro could be terminated for cause. Def. Brief, p. 13. It argues, "By this language, [Crestmont] intended that Plaintiff's employment could be **continued** for more than two years upon mutual agreement by both parties. This language was not intended to impinge upon Crestmont's right to terminate Plaintiff's employment for cause." *Id.* at 14 (emphasis added). This Court disagrees with Crestmont.

The language of the agreement is unambiguous. It clearly states that the parties agreed that Ms. Favaloro would be employed by Crestmont for at least two years, unless the parties agreed to end the relationship prior to that time. The relationship could not be terminated ex parte by either party, with or without cause -- save for a breach of the agreement by the non-terminating party. This is the only meaning the words used would have to a reasonably prudent person. The Court finds that the language of the agreement is unambiguous.

      b.     Does the agreement include the terms of the employee handbook and the drug-free workplace policy?

The Court agrees with Crestmont that the letter is not a fully integrated agreement. However, viewing the facts in the light most favorable to Crestmont, the parties did not agree that Ms. Favaloro would be bound by the employee handbook and the drug-free workplace policy. The Court finds, for purposes of Ms. Favaloro's Motion for Summary Judgment, Crestmont intended Ms. Favaloro to work under the terms of these documents that it sent her with the agreement.

However, it is undisputed that Ms. Favaloro never signed the acknowledgment form, which stated that she had received the handbook and the drug-free workplace policy and had agreed to be bound by their terms. Although Crestmont may have intended that the terms of the handbook and the drug-free workplace policy would apply to Ms. Favaloro, there is no evidence that Ms. Favaloro accepted such terms. *See Ex parte Rush*, 730 So. 2d 1175, 1177-78 (Ala. 1999); *Hall v. Integon Life Insurance Co.*, 454 So. 2d 1338, 1342 (Ala. 1984). Indeed, the evidence shows that, although Crestmont initially demanded Ms. Favaloro sign and return the acknowledgment form to Crestmont, she was allowed to continue working and was not questioned about the form after March. The failure to obtain Ms. Favaloro's assent to be bound by the handbook and the drug-free workplace policy as well as Crestmont's assent to continued employment supports the conclusion that the handbook and the drug-free workplace policy were not part of the agreement.

Moreover, the handbook and the acknowledgment form both state on their face that

employment at the hotel[4] was "at will." With doubt or dispute, Ms. Favaloro's employment was not "at will." Therefore, obviously, the entire handbook and the entire acknowledgment form did not apply to Ms. Favaloro's employment agreement.

The Court finds that the employment handbook and the acknowledgment form, containing the drug-free workplace policy, were not part of the parties agreement. Ms. Favaloro never assented to be bound by the terms or to give Crestmont grounds for terminating the agreement other than by mutual assent of the parties. The handbook and the drug-free workplace policy specifically refer to Decatur Hotel . Defendants concede that Plaintiff did not have an agreement with Decatur Hotel. Def. Brief, pp. 32-33.

           c.     Did Plaintiff breach the agreement by failing to perform her duties as General Manager?

Crestmont contends, "Plaintiff cannot establish the elements essential to her breach of contract claim. In particular, Plaintiff cannot establish her own performance; rather, the evidence shows Plaintiff breached her duty to perform as General Manager in good faith." Def. Brief, p. 19. Crestmont contends that Ms. Favaloro's drug use breached her duty to perform the job of General Manager.

Crestmont cites this Court to the following holding of the Supreme Court of Alabama:

> To justify an employer in discharging a servant or employe[e], the rule, no doubt, is that the servant must have been guilty of conduct which can be construed to be a breach of some express or implied provision in the contract

---

[4]The acknowledgment form and the handbook actually refer to Decatur Hotel and not Crestmont. However, Plaintiff does not argue that her breach of contract claim is against Decatur Hotels.

> of service. It seems to be settled that it is an implied part of every contract of service that the employe[e] will abstain from habitual drunkenness, or repeated acts of intoxication, during the period of his employment. If he be guilty of this indulgence, his conduct will justify his dismissal.

Def. Brief, p. 21 (quoting Bass Furnace Co. v. Glassock, 2 So. 315, 316 (Ala. 1887). The

Alabama Court clearly stated Alabama law when it held: "We do not doubt that public

drunkenness of any employe[e], while in the service of the employer, and manifesting itself

in boisterous and disorderly conduct, either towards the employer or third persons, is such

misconduct as to constitute a violation of the stipulation implied in **every** contract of

service, that **the employe[e] will conduct himself with such decency and politeness

of deportment as not to work injury to the business of the employer**." Bass Furnace,

2 So. at 316 (emphasis added).

Crestmont has alleged that Ms. Favaloro used illegal drugs at the hotel and that she

refused to stop using drugs and seek rehabilitation. Assuming these facts as true for

purposes of deciding Plaintiff's Motion for Summary Judgment, the Court finds that a

disputed issue of fact exists as to whether Ms. Favaloro performed her duties under the

contract or whether her conduct constituted a breach of her promise to perform the duties

of General Manager. If a reasonable jury were to find that Ms. Favaloro breached her

duties under the agreement, Crestmont's subsequent termination of her would not be a

violation of their agreement.

Therefore, Plaintiff's Motion for Summary Judgment is due to be denied.

2.   Defendants' Motion for Summary Judgment – Damages and Reinstatement

Defendants contend that they are entitled to summary judgment on Ms. Favaloro's breach of contract claim because she cannot establish her entitlement to any damages. They contend that, under Alabama law, Ms. Favaloro cannot recover punitive damages and compensatory damages for emotional distress under her breach of contract claim. This Court agrees. *Hobson v. American Cast Iron Pipe*, 690 So. 2d 341, 344 (Ala. 1997)("[T]his court has stated that contract damages are limited to those flowing naturally and proximately from the breach and that their purpose is to put the injured party in the position he should have been in but for the breach. Therefore, neither damages for emotional distress nor punitive damages are appropriate." (citations omitted)).  To the extent Plaintiff is claiming such damages, summary judgment is due to be granted in favor of Defendants as to claims for compensatory damages for emotional distress and for punitive damages arising from Ms. Favaloro's breach of contract claim.

Defendants also contend that they are entitled to summary judgment on Ms. Favaloro's claim for reinstatement and back pay under the Alabama case of *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 345 (Ala. 1997).  In this case, the Alabama Supreme Court held:

> In the summary judgment, the trial court also denied Hobson's remaining claims for reinstatement and back pay, based on the recent decision of *Exxon Corp. v. Baton Rouge Oil & Chemical Workers Union*, 77 F.3d 850 (5th Cir.1996).  The *Exxon* court held that it is against Louisiana public policy to allow reinstatement or back pay where a "safety sensitive employee" is discharged because of positive drug tests in the workplace. In *Exxon* a labor contract required that all claims be submitted to binding arbitration. Despite the binding arbitration requirement, that court held that

Page 21 of 29

Louisiana public policy prohibited awarding reinstatement and back pay to someone who had tested positive for drugs. Similarly, this case involves the discharge of a "*safety sensitive*" employee who tested positive for a controlled substance at the workplace and a third-party review of that termination decision. The facts in this case are less extreme than the situation with which the *Exxon* court was faced, because ACIPCO had no policy requiring that Hobson's termination be submitted to a peer review panel and because the panel's decision was not binding arbitration. Nonetheless, we find the conclusion in *Exxon* persuasive. *We hold that Alabama public policy precludes awarding reinstatement and back pay to a "safety sensitive" employee who is discharged for testing positive for a controlled substance in the workplace*. Therefore, Hobson is not entitled to reinstatement or back pay. The summary judgment was proper to the extent that it held that public policy precluded the claims for reinstatement and back pay.

*Hobson*, 690 So.2d at 345 (emphasis added).

The Supreme Court has described a "safety sensitive" employee as an employee that "discharge[s] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 628, 109 S. Ct. 1402, 1419, 103 L. Ed. 2d 639 (1989).

"The public safety rationale applies where a single misperformed duty could have irremediable consequences, such as where an employee could not rectify his mistake or other . . . employees would have no opportunity to intervene before harm occurs." *Kemp v. Claiborne County Hospital*, 763 F. Supp. 1362, 1367 (S.D. Miss. 1991) (citing *Harmon v. Thornburgh*, 878 F.2d 484, 491 (D.C. Cir. 1989), *cert. denied sub nom.*, *Bell v. Thornburgh*, 493 U.S. 1056, 110 S. Ct. 865, 107 L. Ed. 2d 949 (1990)).

This Court cannot say that Ms. Favaloro's position is "safety sensitive." Defendants point to Ms. Favaloro's access to the master key for the hotel and general responsibility for hotel safety. However, the discharge of her duties was not "fraught" or filled with risk of

injury from a momentary lapse of attention or single misperformed duty. *See, e.g., Exxon Corp. v. Baton Rouge Oil & Chemical*, 77 F.3d 850 (5th Cir. 1996)(chemical plant operations controller); *Hobson*, 690 So. 2d at 342 (tandem truck driver); *Kemp*, 763 F. Supp. at 1367-68 (S.D. Miss. 1991)(scrub technician, but not head of purchasing department, "safety sensitive" position); *see also Choanocyte Utah Copper Corporation v. Becker*, 1999 WL 989338, at *4 (10th Cir. Oct. 29, 1999)(collecting cases).

This Court will not extend a public policy exception to the contractual agreement of the parties on the basis that Ms. Favaloro's job may have included safety responsibilities.

In addition to finding that Ms. Favaloro's is not a "safety sensitive" employee, the Court, viewing the facts in the light most favorable to Ms. Favaloro, notes that this case is distinguishable from the cases cited by Defendant on two other important grounds: (1) Ms. Favaloro never tested positive for illegal drugs and never admitted she had used cocaine; and (2) Defendant, through its agent Mr. Kovach, offered Ms. Favaloro treatment as an option to being terminated for admitted use of marijuana. *Compare Jefferson County Board of Education v. Moore*, 706 So. 2d 1147 (Ala. 1997).

The Court finds that these facts are dispositive of Defendants' motion for summary judgment on Ms. Favaloro's claim for damages. Defendants' motion is due to be denied as to Plaintiff's damage claims based on reinstatement and back pay, but it is due to be granted as to Plaintiff's damage claims based on compensatory damages for emotional distress and for punitive damages.

B.     CLAIMS AGAINST DECATUR HOTEL

Defendant Decatur Hotel contends that it is due to be dismissed on the grounds that

it is not a proper party.   It contends that it was not a party to the employment contract

between Plaintiff and Defendant Crestmont Hotel, pointing to the letterhead on the contract

and Plaintiff's testimony that she was employed by Crestmont to manage a Crestmont

hotel in Birmingham.   Decatur Hotel also contends that the operations of the two entities

are not integrated and that Decatur Hotel is not the altar ego of Crestmont.   Plaintiff has

not opposed this motion.   Therefore, Defendant Decatur Hotel's motion for summary

judgment, seeking to dismiss all claims against it, is due to be granted.

C.     FRAUD

Defendants contend that they are entitled to summary judgment on Plaintiff's fraud

claim because:

> The facts simply do not support Plaintiff's claim of fraud.   Plaintiff offers no
> evidence whatsoever to support her allegation that Quinn made any false
> representations of material fact to Plaintiff, or that he intended not to do the
> acts promised and intended to deceive Plaintiff.
>
> . . .
>
> . . . Plaintiff has failed to present substantial evidence showing that
> fraudulent misrepresentations were made or that Quinn or anyone acting on
> behalf of either of the Defendants acted with the intent to deceive Plaintiff.
> Under the circumstances, Defendants are entitled to summary judgment
> dismissing Plaintiff's fraud claims.

Defendants' Memorandum (Doc. 36), pp. 29-30.   Apparently, Defendants' entire argument

for granting its motion for summary judgment as to Plaintiff's fraud claim is that Plaintiff has

Page 24 of 29

not presented substantial evidence to support her claim. *Id*.

In this Circuit, the moving party must adduce evidence to negate an element of Plaintiff's claim or "point to" evidence in the record that demonstrates that Plaintiff will be unable to prove her claim at trial *before* Plaintiff is required to come forward with any evidence in support of her claim. *Coats and Clark*, 929 F.2d at 608. Simply stating that the non-moving party will not be able to prove her claim at trial is not enough to shift the burden on motion for summary judgment to the non-moving party. *Id*. Therefore, it is axiomatic that simply stating that the non-moving party "has failed to present sufficient evidence" to support her claim *before* the moving party has presented sufficient evidence to shift the burden does not establish that Defendants are entitled to summary judgment or even shift the burden of presenting evidence on motion for summary judgment to Plaintiff.

Defendants have completely failed to establish that they are entitled to summary judgment on Plaintiff's claim of fraud. Therefore, Defendants' Motion for Summary Judgment as to Plaintiff's fraud claim is due to be denied.

**However, it appears that had Defendants taken the time to properly present their arguments for summary judgment on the fraud claim their motion may have had merit. Therefore, in the interest of winnowing the issues for trial, this Court, as set forth in a separate order, will allow Defendants to file a second motion for summary judgment as to Plaintiff's fraud claim.**

## D.   OUTRAGE/INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants move for summary judgment on Plaintiff's claim of outrage on three grounds: (1) "Plaintiff produced no evidence indicating that Defendants intended to inflict emotional distress on Plaintiff;" (2) "Plaintiff admits that she has been on the drug Prozac since before her employment by Crestmont, and that she has not seen a psychiatrist in more than two years;" and (3) "Defendants' actions fall substantially short of conduct that may be characterized as 'atrocious and utterly intolerable in a civilized society' since it is reasonable that Defendants would not want an admitted current user of illegal drugs to manage their hotel." Def. Brief, p. 31. Defendants conclude, "Plaintiff has not produced any evidence of her severe emotional distress, nor can any distress Plaintiff allegedly suffers be inferred to have been caused by Defendants." *Id.* at 32.

This Court will not detain itself with any lengthy discussion of the first two grounds. Defendants' assertion that Plaintiff has not produced sufficient evidence is rejected for the reasons set forth above in this Court's discussion of Plaintiff's fraud claim. Defendants' assertion – that they could not have occasioned Plaintiff to suffer any emotional distress because Plaintiff was already suffering such distress as evidenced by her use of the prescription medicine Prozac – is mere sophistry. Even if this Court were to accept Defendants' premise that because Plaintiff was suffering emotional distress she cannot be damaged by outrageous conduct inducing additional emotional distress, such severe, pre-existing emotional distress may not be inferred merely from the facts of Plaintiff's use of Prozac and her prior treatment by a psychiatrist.

Defendants' third ground, however, asserts that the facts alleged do not, as a matter

of law, rise to the level of a tort of outrage. Under Alabama law, the Court must decide, as a matter of law, whether the conduct alleged rises to the level of a tort of outrage. *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981).

Plaintiff's Complaint alleges that the conduct of Defendants was "oppressive, unconscionable, and so blatantly and socially intolerable that the same is tortuously outrageous." Complaint, p. 9. Plaintiff contends that Defendants made false statements to her for the purpose of inducing her to work for them, that they failed to honor their agreement with her, and that they subsequently breached the agreement. The allegations in the Complaint, if true, do not rise to the level of a tort of outrage. *See Inmon*, 394 So. 2d at 365-68; *see also Mooney v. Henderson & Walton Women's Center-East, Inc.*, 684 So. 2d 1340, 1343-44 (Ala. Civ. App. 1996).

The Court finds that Defendants have shown that they are entitled to summary judgment as to Plaintiff's outrage claim. Plaintiff has failed to submit any evidence or argument in opposition to Defendants' motion for summary judgment as to her outrage claim. Therefore, Defendants' Motion for Summary Judgment as to Plaintiff's outrage claim is due to be granted and that claim is due to be dismissed.

### E.   DECATUR HOTEL'S COUNTERCLAIM – SUBROGATION

Defendant Decatur Hotel contends that summary judgment is due to be granted in its favor on its counterclaim. In its counterclaim it requests "return of the amount Decatur Hotel Corporation has been **charged** by Powertel on Favaloro's unauthorized account, as well as interest from the date of demand." Doc. 2, p. 7 (emphasis added). Decatur Hotel's

entire argument, as set forth in its Principal Brief in support of its motion is as follows:

> During the course of her employment with Crestmont, Plaintiff obtained cell phones for herself and her son in the name of Decatur. Plaintiff testified that she never did get approval for the cell phones. Plaintiff testified that she had no intention of having the hotel pay for her son's personal calls or her own personal calls. Plaintiff testified that Charles Reichman told her that Quinn would not pay for it because he did not provide cell phones to his other general managers. Plaintiff testified that as soon as the bill came, she would have paid it herself. Although Plaintiff contended that she got the cell phone because the hotel wanted to get a hold of her at times when she was not available, she admitted that she had a beeper which was paid for by the hotel. She testified that it was a mistake that the bill was sent to the hotel and not to her personally. Plaintiff also testified that she is willing to pay this debt "absolutely." Based on the foregoing, Defendant Decatur is entitled to summary judgment on its counterclaim as a matter of law.

Def. Brief, p. 40.

The Court recognizes that Plaintiff explicitly agreed that she responsible for the cellular telephone charges. However, the evidence is insufficient to show that such charge should be paid to Decatur Hotel. Nothing in the record indicates that Decatur Hotel has paid Powertel. Without such evidence, Decatur Hotel is not entitled to a judgment in its favor for the amount of the Powertel debt. *Zeigler v. Blount Brothers Construction*, 364 So.2d 1163, 1165 (Ala. 1978)("Moreover, subrogation does not arise until the entire debt is satisfied.").

Therefore, its Motion for Summary Judgment on its Counterclaim is due to be denied.

**However, it appears that had Decatur Hotel taken the time to properly present its argument for summary judgment on its counterclaim its motion may have had merit. Therefore, in the interest of winnowing the issues for trial, this Court, as set**

forth in a separate order, will allow Decatur Hotel to file a second motion for summary judgment as to its counterclaim.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds (1) Plaintiff's Motion for Summary Judgment is due to be denied in its entirety; and (2) Defendants' Motion for Summary Judgment is due to be granted in part and denied in part. The remaining claims for trial are Plaintiff's breach of contract claim and fraud claim against one of the Defendants, namely, Crestmont, L.L.C.; and Defendant Decatur Hotel's subrogation claim. As to (1) all claims asserted against Defendant Decatur Hotel, and Plaintiff's outrage claim asserted against Defendants, the Court finds no existing material issue of triable fact as to these claims and that Defendants are entitled to judgment as a matter of law.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion.

DONE this _____7th_____ day of December, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE